Claudio FERNANDEZ,
Petitioner-Appellant,

v.

Felix RODRIGUEZ, Acting Warden,
New Mexico State Penitentiary,
Respondent-Appellee.

No. 83–2332.

United States Court of Appeals,
Tenth Circuit.

April 4, 1985.

Logan, Circuit Judge, filed concurring opinion.

McKay, Circuit Judge, filed concurring opinion.

Edwin Macy, Asst. Federal Public Defender, Albuquerque, N.M., for petitioner-appellant.

Paul Bardacke, Atty. Gen., and Michael E. Sanchez, Asst. Atty. Gen., Santa Fe, N.M., for respondent-appellee.

Before McKAY, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R. App.P. 34(a); Tenth Circuit R. 10(e). The cause is therefore ordered submitted without oral argument.

Involved herein is an appeal from the denial of a writ of habeas corpus by the United States District Court for the District of New Mexico. The allegation was and continues to be that the defendant was deprived of his constitutional right against self-incrimination in the state court of New Mexico.

Appellant Claudio Fernandez was convicted and sentenced of second-degree murder with enhancement for use of a firearm in the New Mexico state courts. This conviction was affirmed by the New Mexico Court of Appeals and further review (both on appeal and by post-conviction writ) was denied by the New Mexico Supreme Court.

A writ of habeas corpus was filed in the United States District Court. The writ of habeas corpus was there denied after a review by the United States Magistrate and the United States District Court. Review of this ruling is sought by review in accordance with 28 U.S.C. § 2253.

The facts of the case are as follows. This defendant was initially charged with voluntary manslaughter in connection with the death of his wife, Patsy Fernandez. On June 23, 1978 he entered into a stipulation with the state. Contained in the stipulation was a provision which called for the defendant to submit to a polygraph examination administered by the state. The defendant was unaware of the significance of this device. The defendant had been charged with manslaughter and this same agreement provided for the administration of the polygraph test and for its admission at his trial on the manslaughter charge.[1]

---

1. "Defendant Claudio Fernandez has been charged in this cause with voluntary manslaughter. Defendant Claudio Fernandez, after consultation with his counsel and with the advice and consent of same, is willing to take a polygraph examination and the State has agreed with counsel for Mr. Fernandez that if the testimony of Mr. Fernandez before the polygraph examiner constitutes evidence of his innocence and if his testimony can be corroborated by credible evidence, that the State will consider reduction or dismissal of the charges herein.

"It is therefore agreed and stipulated between the parties as follows:

"1. That Claudio Fernandez will take a polygraph examination to be given by Larry Galbreth upon a date and place convenient to the Defendant and to Mr. Galbreth, and will answer questions propounded by Mr. Galbreth concerning the incident out of which this charge arises.

"2. That the polygraph examination will be administered in Taos, New Mexico and will be paid for by the District Attorney's Office.

"3. That Larry Galbreth is qualified to give such examination.

"4. That the polygraph testing procedure used in this case is reliable.

"5. That the particular polygraph examination given to Claudio Fernandez is valid.

"6. That the polygraph examination given to Claudio Fernandez meets the requirements for admissibility as set forth by the New Mexico Supreme Court.

The defendant testified that his attorney, Mr. Natelson, had met with him only briefly before the test and had failed to explain that the polygraph test could be used against him. On the contrary, he testified that Natelson led him to believe that he was required to take the test; that the test was routine. It is important to note that this original attorney failed to explain the mechanics of the test and its consequences. Indeed the attorney was not present when it was taken. The defendant also testified that he did not understand either the stipulation or the polygraph test itself. The evidence also showed that the defendant's knowledge of English was limited.

Mr. Natelson also testified at the trial at the behest of the state. He said he had not explained the mechanics of the polygraph examination. He also testified that *he* had limited knowledge of this polygraph process; that he had seen only one such proceeding at a prior time. The polygraph examiner had been hired by the state. Also, he operated it on the state's behalf.

The polygraph test resulted in the filing of a more serious offense. On June 29, 1978, the defendant was charged and was arraigned on a more serious charge of murder with firearm enhancement. Mr. Natelson withdrew from the case shortly after the arraignment on the murder charge. The public defenders were appointed by the court. They at once moved to suppress the results of the polygraph examination. This was grounded on the basis that defendant had not understood the polygraph stipulation or the questions which had been asked.

The defendant had such a poor grasp of English that he was unable to understand the polygraph questions. But the trial court held a hearing on this motion and admitted the polygraph testimony. Its ruling was that the defendant's English was adequate to understand the meaning of the stipulation and the questions asked during the polygraph examination. The record is replete with evidence as to the defendant's lack of understanding.

During pretrial, counsel for the defendant and for the state had entered into a stipulation which provided for disclosure and discovery.[2] One of the provisions stipulated that each party be given notice of all witnesses who would testify. The state broke this agreement because it called two witnesses not on its endorsed list.

The state failed to identify Tom Cruz and Tina Martinez. Cruz was called the second day of the trial. The defendant objected, claiming that he was unable to investigate the witness or his testimony. The state advised the court that it intended to also call Martinez. The state advised the court that it would turn its report on the testimony of both Cruz and Martinez over to defense counsel. The court allowed both witnesses to testify and ruled that defense counsel would have an opportunity to interview both witnesses before they testified. Both witnesses testified that they had seen the defendant on a road on June 4, 1978. This testimony was pertinent to the question of whether the defendant had told the truth as to his whereabouts to the investigating officers.

"7. That any results of the polygraph examination, and statements of admissions made therein, may be used in the trial of the above action by either the District Attorney or by counsel for the Defendant.

"8. That following the administration of the polygraph examination, the results of the test and the report of the examiner shall be sent to the Assistant District Attorney, Margaret W. Lamb, P.O. Drawer E, Taos, New Mexico 87571 and to counsel for the Defendant, Stephen Natelson, P.O. Box 1752, Taos, New Mexico 87571."

**2.** The agreement between the state and the defendant provided:

It is THEREFORE STIPULATED AND AGREED BY the parties, subject to the approval of the court, that the parties shall consider themselves under the sanction of a court order, as if the respective parties had filed motions under Rules 27, 28 and 32 of the Rules of Criminal Procedure. Initial disclosure by the plaintiff shall be made to the defendant within a few days after arraignment and by the defendant within the thirty days after arraignment. IT IS FURTHER STIPULATED and agreed that each party is under a continuing duty of disclosure concerning all matters covered by said Rules 27, 28, and 32.

On March 17, 1978, the defendant was convicted of second-degree murder by a jury. He was sentenced to a term of not less than 15 nor more than 55 years.

After exhausting his New Mexico state remedies, the defendant sought but was denied habeas corpus relief in the United States District Court.

The strange proceedings described above brought about the equivalent of a detailed confession.

The waiver of the accused's right against self-incrimination and the conviction were carried out without the slightest warning to the accused. It also brought out a new charge—one which was grossly more serious than the original manslaughter case. But beyond that it brought about a sentence of great magnitude—15 to 55 years. In addition he was forced to take a polygraph test—a procedure about which he had no understanding and which introduced evidence which had not been possible.

The defendant raises two issues on appeal. The important contention is whether the trial court erred in admitting the polygraph testimony.[3]

This polygraph examination led to the filing of the murder charge and it brought about the grossly more serious sentence mentioned above. The defendant argues that his inability to comprehend English prevented him from understanding the polygraph stipulation, and that therefore the stipulation was not a valid waiver of his right against self-incrimination.

Defendant argues that his decision to sign the polygraph stipulation was essentially a decision not to object to inadmissible evidence. But worse than that it amounted to a waiver of consent to waive his right against self-incrimination. Unquestionably the defendant made his decision to sign the polygraph stipulation without knowing that he was thereby convicting himself; with the advice of his then counsel. He did not have "sufficient

awareness of relevant circumstances and likely consequences," *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970), all of which is required for a valid waiver of a constitutional right. Our reading of the record convinces us that the defendant was unable to understand either the polygraph stipulation or its consequences. There is ample evidence which supports his meagre grasp of English. His lack of understanding of English is apparent from the attached appendix. Had he understood the workings of the polygraph test he would not have participated. This coupled with his language problem resulted in his conviction.

Because the defendant was unable to speak and understand the English language fluently, it was imperative that his attorney explain to him the possible consequences of taking the polygraph test. This was not done here. We do not dwell on the issue of the adequacy of counsel. Rather, we view the failure of counsel to apprise the defendant of the implications of the polygraph as another indication that the defendant's waiver lacked an intelligent conclusion, if not from him, from his attorney.

The trial judge held a hearing on the motion to suppress the polygraph and determined that the defendant's familiarity with English was sufficient for him to understand the stipulation. Factual issues such as the claimed inability to understand English are properly decided by the trier of facts. *State v. Ramirez*, 89 N.M. 635, 556 P.2d 43 (1976). But whether there was an intelligent waiver of his constitutional rights against self-incrimination at the time he stipulated to the polygraph examination is a question of law and fact which requires a full examination of all the circumstances involved. When such mixed questions of fact and law are presented to federal habeas corpus courts, the federal judge need not defer to the legal determinations of a

---

**3.** Although we do not consider the surprise witnesses to be important, the acceptance of these two witnesses revealed the general approach of this trial as being one in which seemingly all of the evidence was favorable to the state without any safeguard to the defendant such as his rights to refrain from answering. This right was denied throughout the investigation.

state trial judge. Rather, " * * * the (Federal) Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication to the federal judge." *Hance v. Zant*, 696 F.2d 940, 947 (11th Cir.1983), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), *quoting Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.). Our reading of the record indicates that the federal district court's legal conclusion that the defendant's waiver of his right to self-incrimination was made knowingly and intelligently was clearly erroneous. The totality of the circumstances indicate that the defendant did not understand English well enough to comprehend the consequences of the stipulation.

The Supreme Court has clearly ruled that the violation of fundamental constitutional rights is a highly sensitive matter which is not readily waived. This has been emphasized on numerous occasions. The leading case is *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In a stellar opinion by Justice Black the high importance was brought out. The Court said: " '[C]ourts indulge every presumption against waiver of fundamental rights,' and ... 'do not presume acquiescence in the loss of fundamental rights.' " *Id.* at 464, 58 S.Ct. at 1023 (citations omitted). In deciding whether the defendant did validly waive his right against self-incrimination, *Zerbst* directs us to evaluate "... the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Id.* We may find a waiver of the defendant's fundamental right against self-incrimination only if the record clearly demonstrates "an intentional relinquishment or abandonment of a known right or privilege." *Id.; see also North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979).

It is impossible, on the basis of the record before us, to find an intentional and intelligent waiver of these all important rights, particularly a knowing intent to waive his right against self-incrimination. Defendant's English is known to be too limited for us to presume that he could fully understand the terms of the stipulation he signed. Moreover, the record establishes that defendant's original counsel never provided him with enough of an explanation of the mechanics and implications of the polygraph examination to permit him to make an intelligent decision as to whether to sign the stipulation. Under these circumstances, we hold that the district court's finding of an intelligent and knowing waiver is clearly erroneous, and that defendant did not validly waive his constitutional right against self-incrimination.

We reverse the district court's decision and remand this cause to that court with directions to issue a writ of habeas corpus unless the defendant is provided with a new trial.

## APPENDIX

The following passages from the record reflect Mr. Fernandez' limited proficiency in English.

### DIRECT EXAMINATION

BY MR. GALLEGOS:

Q Could you please state your name?

A Claudio Fernandez.

. . . . .

Q (By Mr. Gallegos) Where have you been living?

A New Mexico and Colorado.

Q Where were you raised, Mr. Fernandez?

A In Taos.

Q Where exactly in Taos were you raised?

A In Valdez.

Q Is that a big city or a small city?

A It's a little town.

Q Do you live on something that might be classified as a ranch?

A  Well, just about everything is ranches, small ranches there.

Q  Did you go to school?

A  I did go; but the little I went, I didn't learn anything.

Q  What school did you go to?

A  I went to Valdez and Arroyo Seco and here in Taos.

Q  Okay.  What language, when you were living and growing up here in Valdez, was spoken when you were growing up at home?

A  Spanish.

Q  Did anybody at your home ever speak in English?

A  No, except my brother, but that's after he finished school now.

Q  Do you speak any English?

A  A little bit, not much.

Q  How much English do you figure that you can speak?

A  Well, very little.  I don't understand much.

Q  Do you understand simple things?

A  Not all of them because I didn't go to school.

Q  Do you understand what a polygraph examination is?

A  No, I have never understood.

Q  Did you take a polygraph examination just recently?

A  Yes.  But they didn't tell me anything whether I had to take it or not; like, I had never taken an examination like that before.

Q  Who told you to take it?

A  Stephen Natelson.

Q  When did he tell you to take it?

A  About two weeks after I had been incarcerated.

Q  Was he your lawyer?

A  Yes.

Q  Exactly what did he tell you about the examination?

A  That I had to take it.

Q  For how long a time did you talk to him at that time that he told you that you had to take the examination?

A  About three or four minutes.

Q  Now, are you certain that you understood when he told you—when you claim he told you that you had to take that examination?

A  Well, I didn't understand because I had never taken an examination like that before;  and I didn't understand what he wanted.

Q  Is it possible that he could have been saying that you could take it or not if you wanted to?

A  Well, he didn't tell me none of that. He just told me to take the test and sign the paper.

Q  How many times did you talk to Mr. Natelson during the time that you were expecting—that you were in jail?

A  Two times.

Q  Did you talk to Mr. Natelson prior to taking the polygraph examination?

A  Yes, because he wanted me to pay $300.00 for the test.

Q  How soon prior to the time that you took the polygraph test did you talk to him?

A  He just called me in the afternoon and he asked me if I had $300.00;  and I told him no.

Q  Did you have a conference with Mr. Natelson in regard to the taking of the polygraph test?

A  No.

Q  Did you have a conference with anybody prior to having taken the polygraph test?

A  No.

Q  Did you know Mr. Galbreth?

A  No.

Q  Do you know the person that conducted the polygraph test?

A  No, I had never seen him before. Well, I had never seen him.

Q What was the nature of your conversation with the person that gave you the polygraph test?

A He asked me some questions which were eleven; and then he mentioned the fan, which I didn't understand.

Q Did you understand anything that went on in that room when you took the polygraph examination?

A No, not everything.

Q What did you understand?

A Well, only that he was going to ask me some questions.

Q Did he tell you the nature of those questions?

A He told me that the machine was used for—so he could tell whether he was telling—whether the Defendant was telling the truth or lies.

Q Okay. Did you talk to him at all in Spanish?

A I spoke partly in Spanish and partly in English, a few English words that I knew.

Q Have you ever taken any other schools in regard to learning how to speak English?

A Yes. I went to one in Denver for—an opportunity school for three months.

THE WITNESS: (In English) Three weeks.

THE INTERPRETER: Three weeks, sorry.

Q (By Mr. Gallegos) And did you learn anything from there?

A No.

Q What kind of work do you do?

A I'm a rancher, or I work on a ranch.

Q Do you work out of town sometimes?

A Yes.

Q And what do you do when you work out of town?

A I wash dishes in a few restaurants here in Taos.

Q do you work in Wyoming?

A Yes. I've worked on ranches over there and sheepherding.

.    .    .    .    .

... And this motion can be heard with the same witnesses. So, I'm asking the Court to allow me to present evidence on both these issues by the same witnesses. Some are going to testify as to both issues; some as to only one.

THE COURT: Okay. Call your witnesses.

MR. GALLEGOS: Yes, sir. I call Eraclio—

THE COURT: You'll have to get them yourself; we don't have a bailiff.

MR. GALLEGOS: Okay.

THE COURT: Will you raise your right hand?

(The witness was sworn by the Court.)

THE COURT: Have a seat, sir. Get just as close as you can to this microphone.

THE WITNESS: Thank you.

MR. ERACLIO MARTINEZ,

called as a witness by and on behalf of the Defendant herein, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GALLEGOS:

Q Could you please state your name?

A Eraclio Martinez.

Q And what is your present address?

A Arroyo Seco.

Q And how long have you lived in Arroyo Seco?

A I'd say 43 years—44 years, about.

Q Have you lived there all your life?

A Forty-four years of it.

Q What is your occupation?

A I'm a small farmer.

Q How big of a place is Arroyo Seco?

A I'd say the population is about 500 voters.

Q Okay. Now, do you know or have you come in contact closely with other people throughout the county?

A From where?

Q From the County of Taos.

A Yes.

Q Okay. Are you acquainted with Mr. Claudio Fernandez?

A Yes, sir.

Q And what is the nature of the acquaintanceship you have with Mr. Fernandez?

A The nature?

Q Yes.

A Well, I'd think I've known him as a fairly good citizen, good behavior, was an alcoholic. And he used to work for me off and on and was a good worker. And that's about all I can say.

Q Okay.

A Come from good, decent people.

Q In your relationship with him and your work—he worked for you; is that correct?

A Right.

Q Now, did you converse with him and give him orders and have him do work for you and different tasks and chores that he had to do for you?

A Tell me again, sir.

Q Okay. You ordered him to do different things for you; is that correct?

A Right.

Q Now, what language did you talk to him in?

A Huh?

Q What language did you use?

A Spanish.

Q Okay. Do you mostly speak in Spanish to most of the people?

A Most of the time, yes, sir.

Q Okay. How far away from you did Mr. Fernandez live?

A I'd say that's between four or five miles, I'd say.

Q Okay. Now, did you ever attempt, at any time, to talk to him in English?

A No, only in Spanish.

Q Okay. Why is that?

A Well, that's my language. And I know pretty well that I'm not a very good English talker. Besides, he was worse. He couldn't understand very well to me. I knew that. So, there was no use for me to talk in English to him.

Q Okay. Do you have an opinion as to whether or not he understood when anybody talked to him in English?

A What?

Q Do you think he understood when somebody spoke to him in English?

A Hardly any. Hardly any to me. I don't think there was much of that. The only time he'd talk to get a little vodka at work when he was a little half drunk. But he wasn't that much to understand. I couldn't even understand him very well, either, myself. I didn't want to talk to him in English because I knew I couldn't get along with him that way. I couldn't understand his English.

Q Okay. Do you know where he worked other than when he worked at your place?

A What?

Q Do you know where else he worked?

A Well, yeah. I guess he worked several places here and there with some of the Spanish people, chopping wood and a little bit of work like sometimes he'd help me like bring me wood, sometimes chopping wood, sometimes farm, work like that, irrigating. That's about all he'd do with me and several other people that I know around the vicinity.

Q Okay. Are you aware of him having worked out of the state?

A Huh?

Q Do you know that he worked out of New Mexico?

A Out of New Mexico?

Q Pardon?

A Out of New Mexico?

Q   Yes, sir.

A   Yeah. Well, I understand that he used to work in Wyoming and Craig, I think, herding sheep.

Q   Okay. Now, in your occupation there and your work that you do, do you have any contact with a number of people? About how many people do you happen to contact on a daily basis?

A   I guess—the people he used to work for?

Q   No. No. I'm sorry. About how many people do you think you talk to during a day's work, let's say?

A   I don't think, sir, I'd be able to tell you that because—

Q   But do you talk to many of the people that live around Arroyo Seco?

A   Yes, sir.

Q   Okay. Do you ever talk about the case against Mr. Fernandez at this time?

A   No, sir.

Q   Pardon?

Q   Is that the Taos paper here?

A   Right. Taos News.

MR. GALLEGOS: Okay. Thank you very much.

THE WITNESS: You're welcome.

THE COURT: Wait just a minute, senior. Any cross?

MS. LAMB: No questions.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

THE COURT: Can this man go home?

MR. GALLEGOS: Yes, sir.

THE COURT: You may go home, sir.

THE WITNESS: Thank you, Your Honor.

THE COURT: Call your next witness.

Will you raise your right hand and be sworn?

(The witness was sworn by the Court.)

THE COURT: Be seated, sir. Get real close to the microphone, like that.

MR. RAYMOND TRUJILLO,

called as a witness by and on behalf of the Defendant herein, having been duly sworn, was examined and testified as follows:

## DIRECT EXAMINATION

BY MR. GALLEGOS:

Q   Could you please state your name?

A   Raymond Trujillo.

Q   Mr. Trujillo, what is your present address?

A   Box 2264, Taos.

Q   And what is your present occupation?

A   I'm unemployed now.

Q   What was your occupation before you became unemployed?

A   I was a counselor for the Pre-trial Diversion First Offenders, alcohol related and drugs.

Q   Okay. And when did you work there? When was the last time you worked at that?

A   Last June. This June was the last. I worked there for a whole year as full-time counselor. And now I'm just a volunteer alcoholism.

Q   Do you work for La Tuatah?

A   Yes.

Q   Okay. And you work for that organization. Have you ever come in contact with a Mr. Claudio Fernandez?

A   Yes, I did.

Q   And what was the nature of that contact that you had with him?

A   I was his counselor and—because he had a drinking problem.

Q   Okay. Now, in your activities as his counselor, did you ever ascertain whether or not he understood any at all or any portion of the English language?

Q   Do you have any—in your activities as his counselor, did you talk to him in Spanish or in English?

A   Spanish.

Q   And why was that?

A   Because he had difficulty understanding English.

Q   Okay. Now, did you ever try to talk to him in English?

A   At times I did; but he—he usually used to ask me what I had told him.

Q   Okay. What about forms and papers? Did you ever have him read and did he ever have to fill in any forms?

A   I used to ask him and he used to give me information.

Q   Did you ask him in English or in Spanish?

A   I asked him in English, but I had to repeat in Spanish also.

Q   Okay. As far as you're concerned, could he really understand what was being told if asked of him in English?

A   Not really.

Q   Okay. Do you believe he might have understood simple things like—

A   Simple English, maybe; but not big words.

Q   Okay. Now, in your capacity as a volunteer alcoholism worker, do you come in contact with a number of people during—

A   Yes, I do.

Q   And can you hazard an estimate as to how many people you might come in contact on a daily basis?

A   Well, I—all the people that I contact are people—Spanish speaking people. And they, themselves, have difficulty of expressing themselves in English.

DIRECT EXAMINATION

BY MR. GALLEGOS:

Q   Can you state your name, please?

A   Alex Coca.

Q   Mr. Coca, what is your present occupation?

A   Alcoholism counselor.

Q   And where do you work?

A   At Taos County Mental Health Counsel Alcoholism Program.

Q   Okay. Now, are you familiar with Mr. Fernandez, Claudio Fernandez?

A   I know him, yes.

Q   Now, have you been his counselor?

A   Yes.

Q   Now, in regard to your job—is your job specifically at working with people who were Spanish speaking and unable to speak English?

A   My job descriptions call for Spanish speaking person, yes.

Q   Okay. Now, in your experience with counseling Mr. Fernandez, did you ever ascertain whether or not he could speak English?

A   Never. Never occurred to me.

Q   Did you ever speak to him in English?

A   At some—sometimes, yes.

Q.   But whenever you spoke to him in English, did you ever have to repeat yourself in Spanish?

A   Definitely, yes, to get the message across.

LOGAN, Circuit Judge, concurring.

Although I agree with Judge McKay's concurring opinion I file a separate concurrence because I believe it does not go far enough in addressing the issues presented in this appeal. I agree with Judge McKay that Fernandez' ability to understand English is a factual finding with fair support in the record. While I also agree with Judge McKay that the question of whether petitioner knowingly and intelligently waived his Fifth Amendment right against incrimination is a mixed question of fact and law reviewable by this court, I would comply with the Court's dictates in *Sumner v. Mata*, 449 U.S. 539, 551–52, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981), tying the generalities of 28 U.S.C. § 2254(d) to the specific facts of our case. We should acknowledge that although the state courts here appeared to apply the correct legal standard for determining waiver of Fifth Amendment rights, after consideration of the

record as a whole we are convinced that their factual determination that the waiver was voluntary is not fairly supported by the record and therefore does not warrant our deference. The facts supporting such determination are ably set out in Judge McKay's analysis of the language of the stipulation.

I also believe Judge McKay's concurring opinion falls short by failing to analyze two issues: first, whether polygraph test results are testimonial communications; and second, whether the admission of the petitioner's polygraph test results constituted harmless error in his criminal trial.

The Fifth Amendment privilege against self-incrimination applies only to testimonial communications; criminal defendants normally have no Fifth Amendment right against being compelled to provide physical evidence. Therefore, a criminal defendant may be required to give a blood sample to determine alcohol content, *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966), participate in a lineup, *United States v. Wade*, 388 U.S. 218, 221–22, 87 S.Ct. 1926, 1929, 18 L.Ed.2d 1149 (1967), and provide handwriting exemplars, *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967). But I agree with the Eighth Circuit that evidence derived from a polygraph examination is more accurately categorized as testimonial than physical. *See United States v. Oliver*, 525 F.2d 731, 734–36 (8th Cir.1975) (presumes testimonial nature of polygraph exam results), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976). *See also Bowen v. Eyman*, 324 F.Supp. 339, 341 (D.Ariz. 1970); *contra United States v. Ridling*, 350 F.Supp. 90, 98 (E.D.Mich.1972).[1]

Even though Fifth Amendment guarantees apply to the polygraph examination in question here, we still must consider whether the use of this evidence constituted harmless error in petitioner's state court trial. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court held that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22, 87 S.Ct. at 827. The Court in *Chapman* articulated the rule, however, that before a constitutional error may be characterized as harmless, the reviewing court must be able to declare that it was harmless beyond a reasonable doubt. *Id.* at 24, 87 S.Ct. at 828.

Nevertheless, some constitutional rights are so basic to a fair trial that their infraction may never be treated as harmless error. These rights include the right to be free from coerced or otherwise involuntary confessions. *See Chapman*, 386 U.S. at 23, n. 8, 87 S.Ct. at 828 n. 8. *See also Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) ("*any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law 'even though there is ample evidence aside from the confession to support the conviction.'" (emphasis in original)). The Supreme Court has emphasized that a confession may be rendered involuntary if it is extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence. *Hutto v. Ross*, 429 U.S. 28, 31, 97 S.Ct. 202, 204, 50 L.Ed.2d 194 (1976) (per curiam).

I agree with Judge McKay that in petitioner's stipulation the prosecution appeared to promise to limit the use of the

---

**1.** "It is clear that the protection of the privilege [against self-incrimination] reaches an accused's communications, *whatever form they might take* ..." *Schmerber v. California*, 384 U.S. at 763–64, 86 S.Ct. at 1832 (emphasis added). I believe that although polygraph results are physical evidence in the sense that they are derived from physiological responses to questions, such results are essentially communicative in nature.

Indeed, the Supreme Court in *Schmerber* intimated that the physical evidence obtained from polygraph tests may be properly characterized as testimonial. *See id.* at 764, 86 S.Ct. at 1832 ("Some tests seemingly directed to obtain 'physical evidence,' for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial.").

evidence obtained from the polygraph to the manslaughter charge filed at the time of the exam. I cannot conclude that the state has established that petitioner volunteered to undergo the exam with the prospect that such evidence would be used in a subsequent murder trial. Therefore, the admission of this evidence cannot be harmless error. *Rogers v. Richmond*, 365 U.S. 534, 540–41, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961). But even if petitioner's consent to the polygraph test should be characterized as voluntary for Fifth Amendment purposes, I still cannot conclude that the use of this evidence was harmless beyond a reasonable doubt. The prosecution's case was largely circumstantial; the dispositive issue was whether petitioner's wife committed suicide or was murdered by petitioner. The polygraph examiner was the final state witness, and he testified, among other things, in response to direct questions regarding petitioner's guilt, that petitioner had the highest flunking score he ever observed.

For these reasons I agree that the judgment must be reversed.

McKAY, Circuit Judge, concurring:

I agree with the result reached by the court but for different reasons. Petitioner in this case was originally charged with voluntary manslaughter. On the advice of his attorney, he agreed to take a polygraph examination and stipulated that the results of the test could be used "in the trial of the above action by either the District Attorney or by counsel for the defendant." Several days after the exam, petitioner was charged and indicted on the more serious offense of murder. Petitioner moved to suppress the evidence obtained from the polygraph on the ground that, due to petitioner's inability to understand English, he did not understand the stipulation he signed or the questions asked during the polygraph exam. The trial court denied the motion, finding that petitioner's knowledge of English was adequate to understand the stipulation and the questions asked during the exam. Petitioner was convicted of murder.

The New Mexico Court of Appeals affirmed, and the New Mexico Supreme Court denied certiorari. Petitioner moved for post-conviction relief, including an allegation that, even if the stipulation was valid, it pertained only to the manslaughter charge and did not constitute waiver of his rights in the trial on the subsequent murder charge. The New Mexico Supreme Court denied relief. Petitioner then filed this petition for habeas corpus relief, which the district court denied. This court reverses the district court, and in its opinion holds that the district court's finding that the petitioner knowingly and intelligently waived his fifth amendment rights was clearly erroneous. The court bases its decision on a determination, contrary to the finding of the state trial court, that defendant did not understand English.

The question of petitioner's ability to understand English is a question of historical fact. *See Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (substance of ex parte communications and effect of those communications on juror impartiality are questions of historical fact); *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 848–49, 74 L.Ed.2d 646 (1983) (in determining validity of guilty plea, finding that respondent was "an intelligent individual, well versed in the criminal processes and well represented in all stages of the proceedings by competent and capable counsel," and the inferences fairly deducible from these facts are entitled to presumption of correctness). Such fact findings are to be accorded a "high measure of deference." *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); 28 U.S.C. § 2254(d) (1982). This deference "requires that a federal habeas court more than simply disagree with the factual determinations. Instead, it must conclude that the state court findings lacked even 'fair support' in the record." *Marshall*, 103 S.Ct. at 850. Since there appears to be fair support in the record for the trial court's finding, we cannot base our finding that petitioner did not validly waive his

fifth amendment rights on his inability to understand English.

This does not, however, mean that the district court must be affirmed. The question of whether petitioner knowingly and intelligently waived his constitutional rights is "a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case." *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980); *Hance v. Zant*, 696 F.2d 940, 947 (11th Cir.1983). The trial court's conclusion on this question is open to collateral attack on review. *Cuyler*, 446 U.S. at 342, 100 S.Ct. at 1714.

The waiver of rights such as the right against self-incrimination "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970); *see also Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Given the ambiguities of the stipulation he signed, petitioner cannot be said to have been fully aware of the possibility that information obtained in the polygraph exam could be used against him in a subsequent murder trial, even if he understands English perfectly.

The stipulation, on its face, is limited to application to the manslaughter charge. It states that:

> Defendant Claudio Fernandez has been charged in this case with voluntary manslaughter.... It is therefore agreed and stipulated between the parties as follows:
>
> \* \* \* \* \* \*
>
> 7. That any results of the polygraph exam, and statements or admissions made therein, may be used at the trial of *the above action* by either the District Attorney or by counsel for the defendant.

(emphasis added). At the time of the stipulation petitioner had not been charged with murder and had no knowledge that he would be. The stipulation cannot be said

to constitute knowing and intelligent consent to use of information obtained in the polygraph exam in a later trial for murder.

In addition, the stipulation creates the implication that information obtained in the polygraph exam will only be used to reduce the charges—not to increase them. The stipulation states that "... the State has agreed with counsel for Mr. Fernandez that if the testimony of Mr. Fernandez before the polygraph examiner constitutes evidence of his innocence and if his testimony can be corroborated by credible evidence, that the State will consider reduction or dismissal of the charges herein." No mention is made anywhere in the stipulation that the information may be used to increase the charges. In light of these ambiguities, the district court erred in finding that petitioner knowingly and intelligently waived his rights against self-incrimination for purposes of his murder trial. I therefore concur in the judgment of the court that the judgment must be reversed.